UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HSIAO E. SHIH, CAROL YAO, and | ) | |
| KUANG-TAO HU, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 07 C 6786 |
| | ) | Judge Blanche Manning |
| | ) | |
| TAIPEI ECONOMIC AND CULTURAL | ) | |
| REPRESENTATIVE OFFICE, | ) | |
| | ) | |
|     Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiffs Hsiao Shih, Carol Yao and Kuang-Tao Hu were employed by the Defendant, Taipei Economic and Cultural Representative Office ("TECRO"), in the United States. They allege various violations of federal employment discrimination statutes as well as state law claims. TECRO has moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), contending that the court lacks jurisdiction over the plaintiffs' claims. For the following reasons, TECRO's motion to dismiss is denied in part and granted in part.

**I. Background**

The following facts are drawn from the plaintiffs' complaint and are accepted as true for purposes of the motions to dismiss. TECRO was established under the Taiwan Relations Act, 22 U.S.C. §§ 3301-3316 ("TRA"), to "continue commercial, cultural and other relations between the people of the United States and the people of Taiwan." 22 U.S.C. § 3301(a)(2). TECRO has many offices throughout the United States, including Chicago, Illinois.[1]

---

[1] A helpful discussion of the history of the United States' relationship with Taiwan and the genesis of TECRO is found in *Taiwan v. United States District Court*, 128 F.3d 712, 714 (9th Cir. 1997), which states:

Each of the plaintiffs alleges that TECRO engaged in age discrimination and retaliation in violation of the ADEA.  Plaintiffs allege in their amended complaint that in October 1991, a document entitled "Guideline for Local Employees Hired by ROC Embassies, Consulates and Offices Abroad" was released (the amended complaint does not identify by whom), and at all relevant times was in effect and applicable to TECRO's local U.S. employees.[2]  Paragraph five of the Guidelines, entitled "Age" states, "a person who is qualified for a local employee position must be over 18 years old and must not exceed 45 years old."  Plaintiffs allege that TECRO's actions in attempting to adhere to this policy resulted in discriminatory treatment and retaliation in violation of the ADEA, as well as certain state law violations.

A.     **Plaintiff Shih**

---

When the United States established relations with the People's Republic of China in 1979, it severed diplomatic relations with Taiwan. However, in order to maintain a formal relationship with Taiwan, Congress enacted the Taiwan Relations Act, 22 U.S.C. §§ 3301-3316, to provide a structure for "the continuation of commercial, cultural, and other relations between the people of the United States and the people on Taiwan." *See* 22 U.S.C. § 3301(a)(2) (1994). Under the TRA, those relations are to be conducted by a nonprofit corporation called the American Institute in Taiwan (AIT) on behalf of the United States, 22 U.S.C. § 3305(a), and by a counterpart "instrumentality" on behalf of the people on Taiwan. *See* 22 U.S.C. § 3309(a) (1994). That Taiwan counterpart instrumentality is TECRO, which was formerly known as the Coordination Council for North American Affairs (CCNAA).  *See* Exec. Order No. 12,143, 44 Fed. Reg. 37,191 (1979) (recognizing CCNAA as the instrumentality with authority to act on behalf of Taiwan), and Exec. Order No. 13,014, 61 Fed. Reg. 42,963 (1996) (recognizing TECRO as CCNAA's successor).  In essence, TECRO performs functions similar to the functions performed by embassies of countries with whom the United States maintains diplomatic relations.

[2] ROC refers to the Republic of China, commonly known as Taiwan. http://www.state.gov/r/pa/ei/bgn/18902.htm ("Taiwan still calls itself the 'Republic of China.'")(last visited February 10, 2010).

Shih is a citizen of the United States, residing in Darien, Illinois. At the time of the events in question, Shih was a 59 year-old permanent resident of the United States. Shih was employed by TECRO as a temporary local employee in TECRO's Chicago office for approximately 15 years performing primarily secretarial tasks such as answering phones, and translating public documents and articles contained in public periodicals from English to Chinese. In performing her work, Shih was not privy to confidential government documents, nor was she involved in policy-making decisions.

In August of 2002, Shih requested a promotion from temporary local employee to a Type B regular local employee, a position that Shih believed she was well qualified for. Shih alleges that the promotion to type B regular employee provided improved employee benefits and pay, despite the fact that the work was substantially similar to that which she had been performing for several years. TECRO later informed Shih that due to her age she was not eligible for such a promotion and her request was denied. In April 2007, Shih alleges that she was passed up for the same promotion when TECRO rehired a former temporary local employee between the ages of 18 and 45 who had previously quit in 2006.

In June of 2003, Shih filed the first of two age discrimination charges against TECRO with the Equal Employment Opportunity Commission ("EEOC"). After conducting its investigation into Shih's charges, the EEOC found reasonable cause to believe that unlawful discrimination under the ADEA had occurred. Shih alleges that TECRO retaliated by not giving Shih a pay increase while all other local employees in her office received raises. Shih responded by filing her second EEOC charge, and now alleges that TECRO retaliated again by shutting down the division of the Chicago office in which Shih had worked for the past 15 years. Of the

other employees at Shih's office, Shih was the only employee who was not reassigned and was terminated when the office closed.

Shih seeks damages resulting from TECRO's alleged discrimination (Count I) and retaliation in violation of the ADEA (Count II).

B.   **Plaintiff Yao**

Plaintiff Yao lives in Hinsdale, Illinois and at all relevant times was a citizen of the United States. At the time of the events in question, Yao was 51 years old. Yao was employed by TECRO as a clerk in its Westmont, Illinois, office for approximately 13 years, performing strictly clerical tasks and bookkeeping. At the time TECRO terminated Yao in December 2004, she was the oldest full-time employee working in the Westmont office. Yao was not privy to confidential government documents, nor was she involved in any policy-making decisions.

Yao alleges that after she turned 51 years old, TECRO created a hostile work environment and discriminated against her in order to convince her to quit the position she had held at TECRO for nearly 13 years. Among other acts, Yao alleges that TECRO forced her to perform unassisted manual labor that resulted in injury to her person and work excessive hours without overtime pay, and stopped giving her pay raises while other younger workers continued to receive raises. In March of 2004, Yao filed the first of four charges with the EEOC and the Illinois Department of Human Rights alleging discriminatory treatment in violation of the ADEA. Yao alleges that after she filed her claims, TECRO retaliated by creating an increasingly hostile work environment. Yao alleges that the discrimination culminated in her termination and/or failure to renew her employment contract in December 2004 for pretextual reasons, in retaliation for having filed EEOC claims against TECRO. All of Yao's EEOC charges of

discrimination and retaliation in violation of the ADEA were found to be meritorious by the EEOC.

Yao seeks damages resulting from TECRO's alleged discrimination (Count III) and retaliation (Count IV) in violation of the ADEA, as well as other state law claims: common law retaliatory discharge (Count V), violations of the Illinois Wage Payment and Collection Act (Count VI) and the Fair Labor Standards Act (Count VII).

### C.     Plaintiff Hu

Plaintiff Hu lives in Glendale Heights, Illinois and at all relevant times was a citizen of the United States.  At the time of the events in question, Hu was 70 years old.  Hu was employed by TECRO for approximately 16 years as a part-time office worker performing clerical tasks in the library at TECRO's Westmont office.  Like plaintiffs Shih and Yao, Hu was not privy to confidential government documents and was not involved in any policy-making activities.

According to Hu, after he turned 65 years old in 2001 until his constructive discharge in June of 2006, TECRO created a hostile work environment in an effort to convince him to retire from his position with TECRO.  Among other acts, Hu alleges that TECRO substantially cut his work hours, cut his rate of pay in half and paid younger employees a higher rate than Hu.  Hu then filed a charge of age discrimination against TECRO with the EEOC and the Illinois Department of Human Rights.  Hu further alleges that, as a result of the charges he filed against TECRO, they retaliated against him by creating a work environment that was so hostile he felt he had no other choice but to quit his job.  At the time he quit, TECRO was aware that Hu's EEOC charge was pending, and that the EEOC had made a determination that reasonable cause existed to find that TECRO's treatment of Hu violated the ADEA.

Hu seeks damages resulting from TECRO's alleged discrimination (Count VIII) and retaliation (Count IX) in violation of the ADEA.

## II.     Standard for a Rule 12(b)(1) Motion to Dismiss

The standard of review for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction depends upon the purpose of the motion. *See Freiburger v. Emery Air Charter, Inc.*, 795 F. Supp. 253, 256 (N.D. Ill. 1992). If the defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction, the court must accept all well-pled factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *United Transp. Union v. Gateway Western Ry. Co.*, 78 F.3d 1208 (7th Cir. 1996). If, however, the defendant denies or controverts the truth of the jurisdictional allegations, the court may properly "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993)(citations omitted).

## III.    Analysis

The defendant seeks to dismiss all counts of the plaintiffs' complaint pursuant to Rule 12(b)(1), arguing that the court does not have subject matter jurisdiction over the plaintiffs' claims. Specifically, TECRO asserts that, contrary to the plaintiffs' allegations, TECRO is immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604 ("FSIA"). The plaintiffs have alleged that TECRO is not immune under the FSIA based on the FSIA's commercial activity exception.

<u>Foreign Sovereign Immunities Act ("FSIA")</u>

TECRO contends that it is immune from suit under the FSIA. The FSIA, 28 U.S.C. § 1604, "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover,* 504 U.S. 607, 610 (1992). Indeed, the FSIA provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in the United States. *Id.* (*citing Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-439 (1989)). Under the FSIA, a "'foreign state shall be immune from the jurisdiction of the courts of the United States' unless one of several statutorily-defined exceptions applies." *Id.* at 611. Both parties agree that TECRO should be treated as a "foreign state" for purposes of the FSIA. Thus, under the FSIA, TECRO is presumptively immune from suit unless one of the enumerated exceptions to immunity applies.

In this case, the plaintiffs argue that the "commercial activity" exception gives this court jurisdiction over TECRO. The FSIA's commercial activity exception provides as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case-
>
> > (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," and further states that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct of particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The

Supreme Court has stated that the FSIA "leaves the critical term 'commercial' largely undefined." *Republic of Argentina v. Weltover, Inc.* 504 U.S. 607, 612 (1992).

Despite the perceived lack of guidance from Congress, the Supreme Court has concluded that:

> a state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns. Put differently, a foreign state engages in commercial activity . . . only where it acts in the manner of a private player within the market.

*Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)(internal quotation marks and citations omitted). The *Nelson* court went on to note that:

> [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'

*Id.* at 360-61 (*quoting Weltover*, 504 U.S. at 614)(citations omitted)(emphasis in original).

"We begin our analysis by identifying the particular conduct on which the [plaintiff's] action is 'based' for purposes of the act." *Nelson*, 507 U.S. at 356. As noted by the Supreme Court, the phrase "based upon" "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* at 357 (citations omitted). In *Nelson*, the plaintiff, an American citizen, was recruited to work as a systems engineer for a hospital in Riyadh, Saudi Arabia. Several months into his job, he discovered safety hazards that could have endangered patients' lives. Although he repeatedly reported these hazards, he was told to ignore them. *Nelson*, 507 U.S. at 352. Eventually, however, he was summoned to the hospital's security office where he was arrested by agents of

the Saudi government and transported to a jail cell.  He was shackled, tortured and beaten, was imprisoned in a cell area infested with rats, and was forced to fight other prisoners for food, among other indignities.  *Id*. at 353.  He was finally released 39 days after his arrest and subsequently brought suit against Saudi Arabia for a variety of intentional torts, including but not limited to battery, unlawful detainment, false imprisonment, and inhumane torture.  *Id*. at 353-54.

The Supreme Court concluded that the district court lacked subject matter jurisdiction over the claim because, contrary to the plaintiff's assertions, the commercial activity exception did not apply.  In so concluding, the Supreme Court first noted that the basis of the Nelsons' suit were the alleged torts committed by Saudi Arabia, including Saudi Arabia's "intentional wrongs and . . . [their] negligent failure to warn Scott Nelson that they might commit those wrongs." *Id*. at 360.  The Supreme Court concluded that:

> [T]he intentional conduct alleged here (the Saudi Goverment's wrongful arrest, imprisonment, and torture of Nelson) could not qualify as commercial [activity]. . . . The conduct boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature. Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.

*Id*. at 361-62 (internal citations omitted).

Here, each of the plaintiffs allege a claim under the ADEA and include similar allegations.  Specifically, the plaintiffs allege that in October 1991, a document entitled "Guideline for Local Employees Hired by ROC Embassies, Consulates and Offices Abroad" (the "Guidelines") was released and was in effect at all times relevant and applicable to the facts stated in the FAC.  Paragraph five of the Guidelines is entitled "Age" and states that "a person

who is qualified for a local employee position must be over 18 years old and must not exceed 45 years old."

To succeed on a claim under the ADEA, a plaintiff must demonstrate that she suffered an adverse employment action because of her age. Thus, applying the analytical framework used in *Nelson* to the instant case, the plaintiffs' claims are based on the adverse employment actions they allegedly suffered as a result of their age. The question then becomes--is TECRO's conduct in imposing the adverse employment actions "commercial activity"? Plaintiff Shih alleges that she was not promoted because of her age, plaintiff Yao alleges that she was discriminated against (i.e., was forced to move heavy boxes and office furniture, and forced to work overtime without requisite pay) and ultimately was fired due to her age, and plaintiff Hu alleges that he was discriminated against (i.e., had his hours and rate of pay substantially cut because he would not retire, and was denied an annual bonus) and was constructively discharged due to his age.

The court concludes that this conduct constitutes commercial activity. Making decisions about what tasks employees perform, how much they are paid, or how they are treated in the workplace does not implicate concerns "peculiar to sovereigns." These are decisions that parties in the private sector make everyday. *See, e.g., Hansen v. Danish Tourist Board*, 147 F. Supp. 2d 142, 151 (E.D.N.Y. 2001)(concluding that Title VII and ADEA claims of employee who worked for the Danish Tourist Board were subject to the FSIA's commercial activity exception because the defendant's decisions were "basic employment decisions akin to those made by many small businesses."). *See also Holden v. Canadian Consulate*, 92 F.3d 918, 922 (9th Cir. 1996) (holding that Canadian Consulate's employment of plaintiff, whose "activities were primarily promoting and marketing" products, was a commercial activity under the FSIA); *Zveiter v.*

*Brazilian Nat'l Superintendency of Merch. Marine*, 833 F. Supp. 1089, 1093 (S.D.N.Y. 1993) (holding that Brazilian agency's employment of plaintiff as a secretary in the clerical staff was a commercial activity under the FSIA and that allegations of sexual harassment are "necessarily 'based upon'" defendant's employment of plaintiff).

Nor is the court persuaded differently by TECRO's gloss on how the commercial activity exception should be applied. TECRO argues that because the court should consider the general nature of its activity as a foreign mission, and that such activity was sovereign in nature, the commercial activity exception does not apply and TECRO is immune from suit under the FSIA. For example, TECRO points to *Kato v. Ishihara*, 360 F.3d 106 (2d Cir. 2004), in which plaintiff, a civil service employee in the New York office of the Tokyo Municipal Government ("TMG"), sued for sexual harassment under Title VII. The Second Circuit looked at "whether TMG's activities in New York were typical of a private party engaged in commerce" and concluded that TMG was immune from suit. *Id*. at 111 (relying on *Weltover*, 504 U.S. at 614). Specifically, it found that:

> The record reveals that TMG performed actions that were only superficially similar to actions typically undertaken by private parties. According to Kato's declaration, TMG engaged in "product promotion for Japanese companies, general business development assistance, participation in trade shows on behalf of the companies to promote those companies' products for sale, and leasing office space to those companies for their business development." Although a private Japanese business might engage in these activities on its own behalf-for example, by sending its representatives to trade shows in the United States to promote its products-such a business would not typically undertake the promotion of other Japanese businesses, or the promotion of Japanese business interests in general.
>
> In other words, the fact that a government instrumentality like TMG is engaged in the promotion of commerce does not mean that the instrumentality is thereby engaged in commerce. The promotion abroad of the commerce of domestic firms is a basic-even quintessential-governmental function.

*Id*. at 111-12.

However, while the *Kato* court (and others) focused on the type of work performed by TMG as a whole, the Supreme Court, in *Nelson*, directed that the court should "begin [its] analysis by identifying the particular conduct on which the [plaintiff's] action is 'based' for purposes of the Act." *Nelson*, 507 U.S. at 356 (citation omitted). As noted above, the Supreme Court in *Nelson* concluded that because the Nelsons' intentional tort claims were based on the conduct of the Saudi government in exercising its police powers, such conduct was inherently of a sovereign nature and, therefore, Saudi Arabia had immunity from suit. Here, the court finds that the plaintiffs' claims are "based on" TECRO's management of the plaintiffs' job-related tasks and that under the facts of this case, such conduct constitutes commercial activity. For this same reason, the court is not persuaded differently by TECRO's citations to *Jungquist v. Sheikh Sultan Bin Khalifa,* 115 F.3d 1020 (D.C. Cir. 1997) and *MCI Telecommunications Corp. v. Alhadhood*, 82 F.3d 658 (5th Cir. 1996).

Nor is TECRO's quotation regarding derivative sovereign immunity from *Butters v. Vance*, 225 F.3d 462, 465 (4th Cir. 2000), that "courts define the scope of sovereign immunity by the nature of the function being performed," apposite to the case at hand, which does not require the court to address derivative sovereign immunity.[3] Nor does TECRO's citation to a recent

---

[3] The *Butters* court initially addressed whether the defendant-security company was immune from suit with respect to the plaintiff-employees' state law employment discrimination claims. The security company had been hired to assist in providing security in the United States to the Saudi royal family. Although the plaintiff's supervisors recommended to the Saudi military that the plaintiff be allowed to serve a full rotation in the command post at the Saudi princess's residence, the Saudi military officers denied the request. According to the Saudi military, "such an assignment was unacceptable under Islamic law, and Saudis would consider it inappropriate for their officers to spend long periods of time in a command post with a woman present." *Butter*, 225 F.3d at 464. The Fourth Circuit Court of Appeals agreed with the district court that the nature of the conduct was not commercial stating that "[p]roviding security for the royal family

Fifth Circuit case, *UNC Lear Services v. Kingdom of Saudi Arabia*, 581 F.3d 210 (5th Cir. 2009), cause the court to come to a different conclusion. In *UNC Lear*, the plaintiff was providing third-party support services, pursuant to two contracts, to Saudi Arabia with respect to F-5 aircraft Saudi Arabia had purchased from the United States. The Fifth Circuit concluded that a breach of contract suit brought pursuant to the Technical Support Services ("TSP") contract between the parties, under which the plaintiff's employees provided flight operations services and training in Saudi Arabia to the Royal Saudi Air Force, did not fall within the commercial activity exception. According to the Fifth Circuit, "[u]nlike a contract to buy army boots or bullets . . . the TSP was a contract to provide personnel that were vital to the operation of the national air defense system . . . .[and] were integrated into the RSAF and can be considered military personnel." *Id*. at 216. However, the court found that Saudi Arabia was not immune from a breach of contract lawsuit relating to F-5 parts repair services that the plaintiff provided to Saudi Arabia in Texas. The Fifth Circuit found that "the . . . contract for the repair and replacement of goods is a commercial activity" and thus Saudi Arabia was not immune from the claim based on this contract. *Id*. at 217.

TECRO attempts to analogize the plaintiffs' work situation in this case with the Lear personnel who were based in Saudi Arabia by asserting that "the nature of TECRO, like the Saudi Air Force, is sovereign, and Plaintiff's employment was in a Chinese speaking environment, together with Taiwanese, openly (according to the Complaint) governed by

---

in this country is not a commercial act in which the state is acting 'in the manner of a private player within the market.'" *Id*. at 465 (citation omitted). The Fourth Circuit stated that "a foreign sovereign's decision as to how best to secure the safety of its leaders. . . is quintessentially an act 'peculiar to sovereigns.'" *Id*. (citation omitted). No such similar circumstances exist in the instant case.

Taiwanese civil service rules." Motion to Dismiss at 7. TECRO goes on the assert that "Plaintiffs were integrated into the Taiwanese diplomatic service and could be considered diplomatic personnel." *Id*. The court is not persuaded by TECRO's attempt to characterize the plaintiffs in this case, who were all clerical workers, as "diplomatic" personnel akin to Lear's employees whom the Fifth Circuit found to be "integrated" into the RSAF and considered military personnel.

TECRO's reliance on *Segni v. Commercial Office in Spain*, 835 F.2d 160 (7th Cir. 1987), does not lead this court to a different conclusion. As an initial matter, *Segni* came out before the Supreme Court's decisions in *Weltover* and *Nelson*; thus, the *Segni* court did not have the benefit of the Supreme Court's then most-recent pronouncements on the commercial activity exception to the FSIA when it addressed the merits of that case. In any event, to the extent that TECRO seeks to rely on *Segni*, that case actually undermines its position. In *Segni*, the plaintiff, an Argentine national who was a lawful permanent resident of the United States, was hired by the Commercial Office in Spain to develop the marketing of Spanish wines in the midwestern United States. *Id*. at 161-62. The agreement was memorialized in a contract and when the defendant fired Segni, he sued in court for breach of contract.

The defendant moved for dismissal of the suit on the ground that it was immune under the FSIA. The district court disagreed, concluding that the suit fell under the commercial activity exception to sovereign immunity. The Seventh Circuit affirmed, and in doing so, rejected the defendant's characterization of the plaintiff's work as "diplomatic activity," including the "direct execution of a policy designed to increase Spanish exports and thereby reduce unemployment in Spain," as too broad. The Seventh Circuit concluded that the nature of Segni's activity was "best

described as a contract under which he would provide services in the area of product marketing." *Id*. at 165.  The *Segni* court went on to state that "[t]he hiring of a marketing agent is certainly an 'activity . . . in which a private person could engage'"; and thus, constituted commercial activity.  *Id*. (citation omitted).  Here, similarly, as already concluded above, the firing of the plaintiffs is the type of activity in which a private actor would engage.  Thus, *Segni* supports a finding that the commercial activity exception applies.

TECRO also attempts to rely on the Seventh Circuit's decision in *Wolf v. Germany*, 95 F.3d 536 (7th Cir. 1996), which again is inapposite.  In that case, the Seventh Circuit addressed whether the plaintiff's suit seeking compensation for past persecution from particular funds set up by the German government was subject to the commercial activity exception of the FSIA.  The court concluded that the activities engaged in by the German government did not constitute commercial activity and therefore, it was immune from suit, stating that:

> [The German government] promised to enact and administer legislation in the First Protocol, and it promised to enter into an international agreement with another sovereign state, Israel, in the Second Protocol. It issued regulations from time to time designed to implement its public program to pay reparations to the victims of National Socialism. These are sovereign acts, not the kind of ordinary commercial transaction that a private party might undertake.  The fact that money changes hands when Germany certifies a claimant's eligibility to the Claims Conference, and the Claims Conference then makes either a one-time payment or regular monthly payments does not transform these governmental undertakings into ordinary market transactions.

*Id.* at 543-44.

In *Wolf*, the plaintiff's claim was "based on" the German government's failure to compensate him under the government programs at issue.  Because the restitution programs were not the type that private companies typically engage in, the court concluded that the commercial

activity exception did not apply. Here, however, the plaintiff's claims are based on conduct by TECRO which is of the type engaged in by private actors. Accordingly, the *Wolf* decision does not alter this court's conclusion.

*Punitive Damages and Shih's Retaliation Claim*

In its opening brief, the defendant argues that punitive damages are not available against a foreign state under the FSIA. 28 U.S.C. § 1606 ("a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages"). As noted earlier, the parties agree that TECRO is a foreign state for purposes of the FSIA. Accordingly, the court grants the defendant's motion to dismiss to the extent that it seeks to strike the request for punitive damages.

TECRO also asserts that Shih cannot sue for retaliation based upon the closing of TECRO's Science and Technology Division because that is sovereign conduct. Shih does not respond to this argument and the defendant asks the court to accept this argument as conceded by Shih. In the complaint, Shih alleges that TECRO closed down the Science and Technology Division of its office for "the sole purpose of causing Shih to be fired by Defendant TECRO in order to retaliate against her for filing her ADEA and retaliation charges against it with the EEOC." First Am. Comp., Dkt #35-1, at ¶¶ 25-28. According to the defendant, the "purpose" of the act is irrelevant and the only proper inquiry is as to the "nature" of the act. *Weltover*, 504 U.S. at 614. Because closing a government office is, TECRO argues, "clearly a sovereign act," it contends that this aspect of Shih's claim should be dismissed as falling outside the commercial activity exception. *See* Memorandum in Support of Renewed Motion to Dismiss, Dkt. #71-1, at 13 (*quoting Holden v. Canadian Consulate,* 92 F.3d 918, 920-21 (9th Cir. 1996)("Canada's

decision to close its Consulate which resulted in the loss of Holden's job . . . . was clearly a sovereign act").

The defendant, however, reads Shih's claim too narrowly. As stated earlier, the nature of the act determines whether it is commercial activity. Here, the act was not just closing down the office, as Shih also alleges that she was "the only employee who was not reassigned and was fired when the office closed on November 1, 2007." First Am. Comp., Dkt. #35-1, at 26. Thus, her suit is based on the fact that she was terminated upon the office's closing and the other employees were not. *See Holden*, 92 F.3d at 921 ("Holden, however, does not challenge the right of Canada to close its Consulate. Rather her suit is based on the fact that she was terminated and a younger man was not."). Accordingly, the court denies this aspect of TECRO's motion to dismiss.

## IV. Conclusion

Because TECRO's conduct mirrors that undertaken by private citizens, either individually or as a company, the court concludes that the commercial activity exception applies and TECRO is subject to this court's jurisdiction. *Weltover*, 504 U.S. at 614 ("[W]hen a foreign government acts, not as a regulator of a market, but in a manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA"). For the reasons stated herein, the defendant's motion to dismiss the amended complaint [69-1] is denied in part and granted in part.

**ENTER:**

**Date: February 11, 2010**

_Blanche M. Manning_
**Blanche M. Manning**
**United States District Judge**